# EXHIBIT A

Page 1

1              UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF ILLINOIS
2                     EASTERN DIVISION
3   SHAQUILLE PRINCE,                )
                                     )
4            Plaintiff,              ) Case No. 19-cv-7265
                                     )
5        vs.                         ) Judge Robert Gettleman
                                     )
6   SGT. MICHIENZI #357, et al.,     ) Magistrate Judge Susan Cox
                                     )
7            Defendants.             )
8
9
10
11
12
13
14
15
16           The videotaped remote deposition of MICHAEL
17   MICHIENZI, taken before Christina M. Cummins, CSR and
18   Notary Public, pursuant to the Federal Rules of Civil
19   Procedure for the United States District Courts
20   pertaining to the taking of depositions, at 9:33 a.m. on
21   the 29th day of March, A.D., 2022.
22
23
24

Page 2

1  PRESENT:
2  (ALL PARTIES APPEARED REMOTELY)
3  AKERMAN LLP
   By MR. RYAN KRONE
4     MS. MEGAN HUSSEY
   71 South Wacker Drive - 47th Floor
5  Chicago Illinois  60606
   312.634.5711
6  ryan.krone@akerman.com
   megan.hussey@akerman.com
7
     appeared on behalf of the Plaintiff;
8
   HERVAS CONDON & BERSANI PC
9  By MR. G. DAVID MATHUES
   333 Pierce Road - Suite 195
10 Itasca, Illinois 60143
   630.773.4774
11 dmathues@hcbattorneys.com
12   appeared on behalf of the Defendants.

Page 3

1              I N D E X
2  WITNESS
3    MICHAEL MICHIENZI
4  EXAMINED BY                           PAGE
5    MR. KRONE                         5, 184
6    MR. MATHUES                          179
...
13            E X H I B I T S
14 MICHIENZI DEPOSITION                  PAGE
15 Exhibit 1  Khatib v. Michienzi Lawsuit    17
16 Exhibit 2  General Order 4-002            45
17 Exhibit 3  Sergeant Michienzi's Police Report   94

Page 4

1       VIDEOGRAPHER:  Good morning.  We are going on
2  the record at 9:33 a.m. on March 29th, 2022.  This is
3  media unit one of the recorded deposition of Michael
4  Michienzi taken by counsel for the plaintiff in the
5  matter of Shaquille Prince versus Sergeant Michienzi
6  #357, et al., filed in the United States District Court,
7  Northern District of Illinois, Eastern Division, Case
8  No. 19 CV 7265.  This deposition is being held remote
9  Zoom video conference.  My name is Justin Henriksen from
10 the firm Veritext.  The court reporter is Christina
11 Cummins from the firm Veritext.  I'm not related to any
12 party in this action nor am I financially interested in
13 the outcome.
14      Counsel and all present in the room, everyone
15 attending remotely will now state their appearance and
16 affiliation for the record.  If there are any objections
17 to the proceedings, please state them at the time of
18 your appearance starting with the noticing attorney
19 first.
20      MR. KRONE:  This is Ryan Krone for Plaintiff
21 Shaquille Prince, and I'm joined by my colleague Megan
22 Hussey from Akerman.
23      MR. MATHUES:  David Mathues.  I represent the
24 defendants in this case, and I have no objection to the

Page 5

1  remote proceedings in different states that folks may be
2  in.
3       VIDEOGRAPHER:  Thank you.  Will the court
4  reporter please swear in the witness?
5       MICHAEL MICHIENZI,
6  having been first duly sworn, was examined and testified
7  as follows:
8                EXAMINATION
9  BY MR. KRONE:
10   Q   Mr. Michienzi, can you please state and spell
11 your name for the record?
12   A   Michael Michienzi, M-i-c-h-i-e-n-z-i.
13   Q   My name's Ryan Krone.  I'm one of the
14 attorneys representing Shaquille Prince.  I know you sat
15 in on a previous deposition, so you kind of know the
16 ground rules and how it goes, but I'll still just go
17 over a few.  We have to do our best not to talk over
18 each other.  It's a little tough doing it by Zoom.  But
19 if you're ever not done with a question and I
20 interrupt -- I'm sorry, if you're ever not done with an
21 answer and I interrupt you, please let me know and I
22 will let you finish your answer.  And I'll just ask that
23 you wait until after my question is done to start
24 answering your question.  That will make it easier on

2 (Pages 2 - 5)

Page 62

1  policy says. Would you agree with me that the policy
2  requires if any citizen comes in to file a complaint,
3  the Village of Romeoville officer is to provide them
4  with a verified complaint form if they ask for one?
5      MR. MATHUES: Objection to foundation --
6      excuse me, to foundation.
7  A   Maybe can you rephrase the question?
8  BY MR. KRONE:
9  Q   Do you just want to see the exhibit again and
10 we can look at exactly what I'm referring to?
11 A   Sure.
12 Q   We're looking back at Exhibit 2. Do you see
13 right here, paragraph C, number one -- or I'm sorry.
14 We'll start with paragraph C. When a citizen requests
15 to file a complaint in person, supervisor on duty will
16 do the following: Provide the complainant with a
17 verified complaint form against a sworn police officer.
18 Do you see that?
19 A   Yes, I do.
20 Q   So do you agree that this policy, the Village
21 of Romeoville policy requires the supervisor on duty to
22 provide the citizen with a verified complaint form if
23 they ask for one?
24 A   Correct, sir.

Page 63

1  Q   Were you the supervisor on duty on
2  December 21st, 2018?
3  A   The supervisor of patrol, not the supervisor
4  of myself. So I don't believe that question is correct,
5  and I asked you to rephrase that. I gave him
6  instructions on how to speak to my supervisor so my
7  supervisor could provide him with the complaint.
8      MR. KRONE: Object as nonresponsive.
9  Q   Were you the supervisor on duty on
10 December 21st, 2018?
11     MR. MATHUES: Objection to asked and answered.
12 A   I was the supervisor of patrol. I was not the
13 supervisor of myself, sir.
14     MR. KRONE: Objection, nonresponsive.
15 Q   Were you the supervisor on duty on
16 December 21st, 2018?
17     MR. MATHUES: Objection to form, vague as to
18     supervisor and objection to asked and answered.
19 A   I guess can you rephrase the question for me,
20 sir?
21 BY MR. KRONE:
22 Q   Sure. Okay. You're looking at this policy.
23 Tell me what your understanding of what the supervisor
24 on duty means.

Page 64

1  A   My -- my understanding is that I'm the
2  supervisor of the patrol shift that's going on, and I
3  was a supervisor of the traffic unit on the date in
4  question.
5  Q   That's not what I'm asking. My question is
6  per this policy, what is your understanding of what the
7  supervisor on duty means?
8      MR. MATHUES: Objection to asked and answered.
9      He just answered it.
10 A   I believe I'm going to go back to the
11 beginning portion. You asked me to tell you to let me
12 finish answering a question, so can you repeat the last
13 question so I could finish answering my question first?
14 BY MR. KRONE:
15 Q   Sure. Based on this policy, what do you
16 understand the supervisor on duty to mean?
17 A   My understanding per this policy that's in
18 front of me is the supervisor on duty is the supervisor
19 of what personnel is beneath me at that time.
20 Q   Okay. So is there a specific person that is
21 the supervisor on duty at all times at the Village of
22 Romeoville?
23     MR. MATHUES: Objection to form, vague.
24 A   Can you rephrase that question for me?

Page 65

1  BY MR. KRONE:
2  Q   Is there always a supervisor on duty at all
3  times at the Village of Romeoville?
4  A   I would believe there's always a supervisor of
5  patrol on duty at all times.
6  Q   First time Mr. Prince came in, he was sent to
7  you to discuss his complaint, correct?
8  A   Correct.
9  Q   Why was he sent to you?
10 A   Because I was the supervisor of patrol on duty
11 that day.
12 Q   Okay. So the second time when he came back
13 in, you were also the supervisor of patrol on duty that
14 same day, correct?
15 A   Correct.
16 Q   And per this policy, the supervisor on duty
17 will do the following, provide the complainant with a
18 verified complaint against a sworn peace officer form,
19 that's what the policy says, correct?
20 A   Yes, it does, sir.
21 Q   And the second time Mr. Prince came back in,
22 as the supervisor on duty, did you provide him with a
23 blank verified complaint against a sworn police officer
24 form?

17 (Pages 62 - 65)

Page 66

1      MR. MATHUES: Objection to form, foundation,
2   argumentative.
3   A   No, I did not, sir.
4  BY MR. KRONE:
5   Q   Because you did not provide him with a
6  verified complaint against sworn police officer form,
7  was that a violation of policy per this Exhibit 2?
8      MR. MATHUES: Objection to asked and answered,
9   foundation and to the extent it calls for
10   speculation.
11  A   No, sir.
12 BY MR. KRONE:
13  Q   Why not?
14  A   I'll answer it again. I was not the
15 supervisor of myself. I was the supervisor of patrol.
16 That's why he was given the first one but not the second
17 one. And on the second one he was given complete
18 specific instructions, date and a time range of when to
19 come in to file and how to file the complaint.
20     MR. MATHUES: We've been going about an
21   hour --
22     MR. KRONE: Yeah, let me finish this question
23   and we can take a break. Objection, not
24   responsive.

Page 67

1   Q   So my question is why -- we established you
2  were the supervisor on duty December 21st, 2018,
3  correct?
4      MR. MATHUES: Objection to -- objection to
5   foundation.
6   A   I was the supervisor of patrol that day.
7  BY MR. KRONE:
8   Q   And per the policy, the supervisor on duty
9  provides the complainant -- will do the following:
10 Provide the complainant with a verified complaint
11 against a sworn police officer form, correct?
12  A   Correct, sir.
13  Q   If a supervisor just in general per this
14 policy, if a supervisor on duty does not provide a
15 citizen with a verified complaint against a sworn peace
16 officer form, is that a violation of this policy?
17     MR. MATHUES: Objection to -- same objections
18   to the same question before and also asked and
19   answered.
20  A   Can you rephrase the question? Now you stated
21 in general and --
22 BY MR. KRONE:
23  Q   Right.
24  A   To understand it better.

Page 68

1   Q   Sure. In general, if the supervisor on duty
2  at the Village of Romeoville does not provide a
3  complainant with a verified complaint form when they ask
4  for one, is that in violation of the policy we looked at
5  in Exhibit 2?
6   A   No, sir.
7   Q   Why not?
8   A   I believe I asked and answered this, and you
9  keep on telling me I'm not responsive. Please be
10 patient with me. I'm trying to explain this as best as
11 I can. I am the supervisor --
12  Q   I'm sorry, I just want to -- just to make sure
13 we're on the same page, I'm not asking -- I'm just
14 asking in general. I'm not asking about this specific
15 situation with Mr. Prince.
16  A   Now you rephrased the question or changed the
17 question.
18  Q   That's the same question I just asked you.
19  A   I would ask that we ask the court reporter to
20 rephrase because my understanding was one time you asked
21 in general and one time about the day in question in
22 hand. Those are two different questions to me.
23  Q   Sure. Ten minutes ago I did ask about
24 Mr. Prince, and now I asked a new question. That's what

Page 69

1  you do at depositions.
2      MR. MATHUES: Objection --
3      MR. KRONE: Christina, can you please read
4   back my prior question? And then we'll take a
5   break after we get an actual answer.
6      MR. MATHUES: Objection to argumentative.
7      (Discussion off the record.)
8      (Question read as follows:)
9      "Q   In general, if the supervisor on duty at
10   the Village of Romeoville does not provide a
11   complainant with a verified complaint form when
12   they ask for one, is that in violation of the
13   policy we looked at in Exhibit 2?"
14 BY MR. KRONE:
15  Q   Do you understand the question now,
16 Mr. Michienzi?
17  A   No, I do not. I'm extremely more confused.
18 Can you repeat the question that you want me to answer?
19  Q   Okay. All right. Let me put Exhibit 2 back
20 up. And I want to take a break, I just want to make
21 sure we get through this line of questioning that I
22 thought was going to take about 30 seconds. Let me put
23 this up.
24     Okay. Do you see right here, Mr. Michienzi,

18 (Pages 66 - 69)

Page 82

1 speaking with Mr. Prince?
2   A   Why he was confused with some of the events,
3 why he didn't understand my instructions, why I had to
4 repeat myself over and over again, why he kept on
5 repeating some of the same things he was talking about
6 after given instructions by me, even to the point that
7 his person that he came in here with had to speak up for
8 him and say they both understood when it was perfectly
9 clear that he was not understanding.
10   Q   Why did you think he was possibly on drugs?
11   A   I believe I was giving clear, concise
12 instructions while speaking to him, and he wasn't
13 understanding.
14   Q   So because he wasn't understanding your
15 instructions, you thought he could have been on drugs of
16 some kind?
17   A   Possibility, possibility went through my mind,
18 sir.
19   Q   Do you have any reason to believe Mr. Prince
20 was armed?
21   A   Can you repeat that?
22   Q   Sure.  Did you have any reason to believe
23 Mr. Prince was armed?
24   A   While in the lobby, confirming?

Page 83

1   Q   Correct.
2   A   No, I did not believe him to be armed in the
3 lobby.
4   Q   Did you have any reason to believe he was
5 armed at any point during the events of December 21st,
6 2018?
7   A   Yes, I did, sir.
8   Q   Why did you have a reason to believe he was
9 armed at another point but not armed when he was in the
10 lobby?
11   A   At some point he entered a white car that was
12 in the parking lot.  And after that he fled from me.
13 When he fled from me and I eventually located him, his
14 hands were in his pocket.  And when I asked him to
15 remove them, he was not removing them.  And through
16 training, experience, I noticed this to be a sign that
17 sometimes officers are ambushed or shot by an offender
18 or suspect at that time.  So it was one of the things
19 that went through my mind.
20   Q   When you were in the department with
21 Mr. Prince, did you have any reason to believe he had
22 committed a crime?
23   A   When he came in originally or when he was --
24   Q   Correct, the first time when he came in on

Page 84

1 December 21st, 2018 and you met with him and
2 Miss Anderson.
3   A   No, I do not believe he committed a crime at
4 that point.
5   Q   Did you have any reason to believe he might
6 have a warrant out for his arrest?
7   A   As -- as the conversation progressed, yes, one
8 of the things that went by is that he may -- he may have
9 a warrant.
10   Q   And why were you suspicious that he may have a
11 warrant?
12   A   He wouldn't give me full information.  He was
13 being kind of evasive in his responses to some things.
14   Q   And in your experience is that uncommon for
15 citizens when they speak to police to be evasive?
16       MR. MATHUES:  Objection to form -- excuse me.
17   Objection to form.
18   A   It can be, but throughout the discussion you
19 try to find validity to somebody being uncooperative
20 with the police, whether it's emotional or possible
21 warrants or something like that.  So yes, I find it to
22 be -- I find it to be a sign that he might have had a
23 warrant.
24

Page 85

1 BY MR. KRONE:
2   Q   Well, he was there on his own free will,
3 correct?
4   A   Yes, sir.
5   Q   He wasn't there because you had brought him in
6 for questioning or anything like that, correct?
7   A   Correct, sir.
8   Q   So it wasn't like he was being evasive when
9 you were questioning him about events that you brought
10 him in for?
11   A   That question didn't make sense because he --
12   Q   So -- so he was giving you the information he
13 wanted to give you because he came in on his own free
14 will, correct?
15   A   Correct.
16   Q   So why would that make you suspicious that he
17 might have a warrant?
18   A   When I asked him for some clarification and
19 further information about himself, he was evasive.  And
20 then obviously as I spoke, there were several different
21 mood changes or several different demeanor changes with
22 Mr. Prince throughout our interaction.
23   Q   So are mood changes signs that a citizen might
24 have a warrant out for their arrest?

22 (Pages 82 - 85)

Page 106

1  Q  So Mr. Jones took her into custody. Did he
2  take her inside the department?
3  A  Yes.
4  Q  And then you and Mr. Prince were still by
5  Selena Anderson's vehicle?
6  A  We were in that proximity.
7  Q  Was Mr. Prince still in the vehicle after
8  Miss -- after Miss Anderson had been taken away?
9  A  I don't recall.
10  Q  What did you say to Mr. Prince after
11  Miss Anderson was taken away by Mr. Jones?
12  A  At some point I asked him for his date of
13  birth.
14  Q  Did he give you his date of birth?
15  A  Yes, he did.
16  Q  And then what happened next?
17  A  We had a conversation. I stalled him for
18  dispatch to run the warrant and continued to talk to
19  him. And then I watched him run away from me again at
20  which point I began following him while walking eastward
21  in front of the building, which would have been on the
22  south side of the building. I kept him in my line of
23  sight. And once dispatch told me he had a warrant, by
24  that time he was closer to me because of the direction

Page 107

1  he took. I told him now he had a warrant. He was going
2  to be placed under arrest, and he fled.
3  Q  Did Mr. Prince at any point ask you if he was
4  under arrest?
5  A  Yes, sir.
6  Q  And what did you tell Mr. Prince?
7  A  When he originally asked me in front of the
8  station on the south side I told him no.
9  Q  And what did Mr. Prince do after you told him
10  no?
11  A  I believe there was more than one time he was
12  told or directed no. He walked away and came back.
13  There was -- there was a -- there was a few-minute
14  interaction with him, so several things.
15  Q  After he walked away and came back, did he
16  again ask you if he was under arrest?
17  A  Yes.
18  Q  And what did you tell him?
19  A  The second time I was more indirect or going
20  around the question telling him did I tell you you were
21  under arrest.
22  Q  Why were you being indirect? Shouldn't that
23  be a pretty simple answer, you're either under arrest or
24  you're not under arrest?

Page 108

1  A  I originally told him no and then I was
2  stalling for time to see if he had a warrant because I
3  ran him through dispatch on my radio.
4  Q  So after you told Mr. Prince, I think you said
5  did I say you were under arrest, what did Mr. Prince do
6  next?
7  A  He took off running against eastbound from the
8  front of the station.
9  Q  All right. And when he took off running, was
10  that committing a crime?
11  A  No, sir.
12  Q  Because you had not told him he was under
13  arrest, correct?
14  A  Correct.
15  Q  And what did you do next?
16  A  As I said, I continued to keep him in my
17  sight, and I walked eastbound in the general direction
18  that he was running.
19  Q  And why did you walk after Mr. Prince if he
20  had not done anything illegal to your knowledge?
21  A  When I ran him and he took off running, my
22  suspicion at this point was that he had warrants or some
23  reason to take off running. So I kept him in my line of
24  sight till at least I could find out if he had warrants.

Page 109

1  Q  Did you tell him that you ran his name for
2  warrants?
3  A  Did I tell him that?
4  Q  Correct.
5  A  No, I did not, sir.
6  Q  So he had -- to your knowledge nothing you
7  told him gave him any reason to believe you were running
8  his name for warrants?
9  A  I believe he heard me over my radio run his
10  name and date of birth.
11  Q  When did that happen during that interaction?
12  A  In front of the station.
13  Q  Okay. And was Mr. Prince next to you?
14      MR. MATHUES: Objection to form, vague.
15  A  He was in front of me when I ran him, not next
16  to me.
17  BY MR. KRONE:
18  Q  But he was directly in front of you with -- I
19  mean, 5 feet away or how far away do you think he was?
20      MR. MATHUES: Objection to form, compound.
21  A  I can't give you the exact distance. He was
22  in front of me is all I can recall.
23  BY MR. KRONE:
24  Q  When you want to run someone's name for a

28 (Pages 106 - 109)

Page 138

1  him for those warrants?
2    A    They were not in our geographical limitations.
3    Q    And after you found out you could not arrest
4  him for those warrants, you still went ahead and
5  arrested him, correct?
6    A    No, sir.
7    Q    On December 21st, 2018 you did not -- you did
8  not arrest Mr. Prince?
9    A    I did arrest him on that date.
10   Q    Then why did you just say you did not arrest
11 him?
12       MR. MATHUES:  Objection to mischaracterizes
13   the testimony.
14   A    I believe your question was after I found out
15 the warrants were not valid, then I arrested him.  He
16 was already in custody when I found out the warrants
17 were not within our geographical limitations.  There was
18 more than one charge on Mr. Prince at that time.
19 BY MR. KRONE:
20   Q    Okay.  And we need to take a break here in a
21 minute.  Just let me ask you one more question.  And I
22 guess what my question was, maybe it wasn't a great
23 question.  You still charged him with a crime even after
24 you found out you could not arrest him on those

Page 139

1  warrants, correct?
2    A    Yes, sir, I did.
3       MR. KRONE:  All right.  Do you want to take a
4    ten-minute break?  I don't think I have a ton more.
5    So we can take a lunch if you guys want, but I
6    can't imagine that I have more than 30 more
7    minutes.
8       VIDEOGRAPHER:  We are going off the record at
9    12:36 p.m.  This is the end of media unit two.
10      (Recess taken.)
11      VIDEOGRAPHER:  Okay.  We are back on the
12   record.  The time is 12:48 p.m.  This is the
13   beginning of media unit three.
14 BY MR. KRONE:
15   Q    Mr. Michienzi, do you understand you are still
16 under oath?
17   A    Yes, sir.
18   Q    And did you speak with anyone during the
19 break?
20   A    Yes, I did.
21   Q    Did you speak with anyone besides your
22 attorney?
23   A    Yes, I did.
24   Q    Who did you speak with?

Page 140

1    A    I saw one of our civilian employees and I said
2  hello to him.
3    Q    In your career other than the instance with
4  Mr. Prince, have you ever had a citizen come in to file
5  a complaint and you ran their name for warrants at the
6  same time?
7       MR. MATHUES:  Objection to foundation.
8    A    It was just a long question.  I -- I believe I
9  heard it, but can you repeat it one more time for me,
10 please?
11 BY MR. KRONE:
12   Q    Sure.  Aside from Mr. Prince and
13 Miss Anderson, in your career in law enforcement have
14 you ever had a situation where a citizen comes in to
15 file a complaint and you end up running their name for
16 warrants prior to them leaving the department?
17      MR. MATHUES:  Same objection.
18   A    Yes, I have, sir.
19 BY MR. KRONE:
20   Q    How many times has that occurred?
21   A    I run them all the time, but for warrants,
22 they come back when you run a subject's name and date of
23 birth or their driver's license through dispatch.  But
24 it probably would have happened, for specifically for

Page 141

1  warrants, a handful of times based off of certain --
2  certain circumstances.
3    Q    And you said you run them all the time, what
4  do you mean by that?
5    A    Every time somebody comes in for a citizen's
6  complaint, I try to gather as much information as
7  possible.  By doing so I let my dispatch know so it's on
8  the call for service of who I spoke to.  So it's done
9  over the radio.  And in turn they usually run them for
10 warrant or run them through the LEADS system, which
11 would come back for alerts or warrants.
12   Q    So any time a citizen comes in to file a
13 complaint with you, their name is ran for warrants?
14      MR. MATHUES:  Objection to the extent it
15   mischaracterizes testimony.
16   A    They're ran.  I can't tell you what dispatch
17 does, but I know there were specific times that I did
18 ask if -- them to be checked through county for
19 warrants, yes, on some of them.
20 BY MR. KRONE:
21   Q    Okay.  When you say they're ran, I mean, what
22 is -- what is the difference between running them and
23 running them for warrants?
24   A    When I just give their name over the radio, I

Page 162

1  of policies. I don't know if it's covered in there
2  or not. I'll check and --
3      MR. KRONE: Yeah, and I could have missed it.
4  I'll take a look. If I don't see it, I'll let you
5  know.
6      MR. MATHUES: And sometimes I may look at a
7  policy and it may cover something or not cover
8  something and I'm not reading it right. So I will
9  speak with Chief Kroll -- without waiving
10 attorney-client privilege, I will represent to you
11 that I will speak with Chief Kroll and Deputy Chief
12 Hromadka this week. If you don't have it, I'll get
13 it to you.
14     MR. KRONE: Okay. Fair enough.
15  Q  Okay. So as a law enforcement officer, can
16 you run a warrant on any individual you like?
17     MR. MATHUES: Objection to form -- to
18 incomplete hypothetical and to form, vague.
19  A  Can you rephrase the question?
20 BY MR. KRONE:
21  Q  Sure. Can you run a warrant on any citizen
22 you like at any time?
23  A  No, sir.
24  Q  If you pass someone on the street and they

Page 163

1  look at you funny, are you entitled to run their name
2  for warrants?
3   A  No, sir.
4   Q  If you pass then one on the street and they
5  look like they're on drugs, are you entitled to run
6  their name for warrants?
7      MR. MATHUES: Objection to foundation and to
8      incomplete hypothetical.
9   A  Could we clarify if I'm in my official
10 capacity or if I'm off duty?
11 BY MR. KRONE:
12  Q  Oh, yeah, these questions are all in your
13 official capacity.
14  A  If I could justify having some knowledge and
15 police matter, whether it's previous experience that I
16 can articulate, then I could run a subject through
17 LEADS.
18  Q  Do you have any previous experience with
19 Mr. Prince?
20  A  No, I do not, sir.
21  Q  But you ran his name through LEADS because I
22 think you testified he was acting funny essentially?
23     MR. MATHUES: Objection to the extent it
24     mischaracterizes prior testimony.

Page 164

1   A  Yes, well after the fact of our initial
2  conversation, I ran him through LEADS based off of
3  knowledge that I had in my official capacity as an
4  officer.
5  BY MR. KRONE:
6   Q  Knowledge you have what?
7   A  That the subject he came in had a warrant. He
8  was being evasive. He was being indifferent. He was
9  refusing to give me it. And when I asked him for it and
10 he eventually gave me it and I ran it.
11  Q  He was refusing to give you what?
12  A  All of his information.
13  Q  Well, was he required to?
14  A  He was not.
15  Q  Does that mean that he would have had a
16 warrant out for his arrest because he didn't want to
17 give you all his information?
18  A  No, sir --
19     MR. MATHUES: Objection to incomplete
20     hypothetical.
21  A  No, it does not.
22 BY MR. KRONE:
23  Q  So just to make sure we're clear, you ran his
24 name for warrants because you believed he was on drugs

Page 165

1  or possibly was on drugs and because he was being
2  evasive and not providing you with certain information
3  that he was not actually required to provide you?
4      MR. MATHUES: Objection to mischaracterizes
5      prior testimony.
6   A  No, there were -- there were several reasons.
7  I wanted to put him on the call log. I wanted to have
8  his full name and his information on there. Then I
9  wanted to run him because I saw many different signs. I
10 believed he might be on drugs. I had a subject with --
11 he had a subject with him that had warrants. And he was
12 being evasive throughout the whole thing. And once he
13 gave me his date of birth, it was in my -- my -- my
14 ability to run him, so I did.
15 BY MR. KRONE:
16  Q  Okay. You said you wanted to put him on a
17 call log, correct?
18  A  Correct.
19  Q  To put him on a call log you didn't have to
20 run his name for warrants, though, isn't that true?
21  A  Yes, that is true.
22  Q  Okay. So I'm not trying to make you repeat
23 this, I just want to make sure we're clear on the reason
24 you ran his name for warrants, because you thought he

42 (Pages 162 - 165)

Page 166

1 might have been on drugs and because he was being
2 evasive. Are those two -- are those two of the reasons
3 and are there any additional reasons?
4    A   Those are two of the reasons and yes, there's
5 additional reasons.
6    Q   What are the additional reasons?
7    A   He was with a subject there who had several
8 warrants -- who had multiple warrants.
9    Q   But prior to learning that she had warrants
10 you had already -- you testified you had already started
11 thinking about running him for warrants, correct?
12       MR. MATHUES: Objection to the extent it
13    mischaracterizes prior testimony.
14    A   You are correct that I started thinking about
15 it.
16 BY MR. KRONE:
17    Q   All right. So that really can't be a reason
18 that she had warrants because you didn't know that at
19 the time, correct?
20       MR. MATHUES: Objection to mischaracterizes
21    the testimony and to form and foundation, vague as
22    to time.
23    A   A hundred percent false.
24

Page 167

1 BY MR. KRONE:
2    Q   And why is it a hundred percent false?
3    A   Because I said I started thinking about it,
4 but I couldn't have run him because I didn't have his
5 date of birth until he gave it to me which was after the
6 time that she was in custody for the warrants.
7    Q   Do you remember verifying responses to
8 interrogatory requests in this lawsuit?
9    A   Yes, I do.
10    Q   And you verified those under oath?
11    A   Yes, I do.
12    Q   In response to one question you responded, "I
13 came to the lobby of the Romeoville Police Department to
14 speak with him. As the encounter continued I became
15 suspicious that plaintiff may have an active warrant and
16 intended to continue to interact with him until I
17 learned if that was true." So while you were -- so in
18 that answer -- I mean, is that a truthful statement that
19 I just read to you?
20    A   Your question is is that a truthful statement?
21    Q   Is that a truthful statement?
22    A   It is a truthful statement.
23    Q   So while you were at the station you became
24 suspicious that plaintiff may have an active warrant and

Page 168

1 attempted to continue to interact with him until you
2 learned if that was true?
3    A   Correct.
4    Q   But you didn't find out Miss Anderson had
5 warrants until after you left the station, correct?
6    A   Correct.
7    Q   So how is that one of the reasons why you were
8 still at the station that you became suspicious and you
9 continued to interact with him to determine if it was
10 true?
11       MR. MATHUES: Objection to mischaracterizes
12    prior testimony, to form and foundation.
13    A   I don't know where you don't understand that
14 interrogatories and my report and my testimony are all a
15 summary of the events that took place. They're not a
16 specific timestamped chronological order, everything
17 happened at 10:01 example being. I gave you a summary
18 of it all and I stand by that. And we were still at the
19 station, not inside the station, when we were speaking
20 to Selena about the warrants in her white car. That was
21 still at the station. It was not inside, but it's at
22 the station.
23 BY MR. KRONE:
24    Q   So your testimony, I want to make sure I'm

Page 169

1 clear, you didn't decide to run Mr. Prince's name for
2 warrants until after you knew Miss Anderson had
3 warrants?
4    A   I couldn't run him for warrants at that time
5 because I didn't have his date of birth.
6       MR. KRONE: Object to nonresponsive.
7    Q   I'm not asking if you could or you couldn't,
8 I'm asking you when did you make that decision that you
9 were going to try to run his name for warrants,
10 regardless of what information you had, was that before
11 you found out Miss Anderson had warrants or was that
12 after?
13    A   When I thought I was going to? It was before
14 the fact. When I ran him for warrants, it was after the
15 fact.
16    Q   So when you thought you were going to,
17 Miss Anderson having any warrants had nothing to do with
18 your decision to think you were going to run his name
19 for warrants?
20       MR. MATHUES: Objection to form, foundation.
21    A   It did, and that added to the facts.
22       (Interruption by court reporter.)
23       (Discussion off the record.)
24

43 (Pages 166 - 169)

Page 186

1 STATE OF ILLINOIS)
) SS.
2 COUNTY OF C O O K)
3    The within and foregoing deposition of the
4 aforementioned witness was taken before Christina M.
5 Cummins, C.S.R., and Notary Public, at the place, date
6 and time aforementioned.
7    There were present during the taking of the
8 deposition the previously named counsel.
9    The said witness was first duly sworn and was
10 then examined upon oral interrogatories; the questions
11 and answers were taken down in shorthand by the
12 undersigned, acting as stenographer and Notary Public;
13 and the within and foregoing is a true, accurate and
14 complete record of all of the questions asked of and
15 answers made by the aforementioned witness, at the time
16 and place herinabove referred to.
17    The signature of the witness was not waived,
18 and the deposition was submitted, pursuant to Rules
19 30(e) and 32(d)4 of the Rules of Civil Procedure for the
20 United States District Court, to the deponent per copy
21 of the attached letter.
22    The undersigned is not interested in the
23 within case, nor of kin or counsel to any of the
24 parties.

Page 187

1    I further certify that the deposition
2 terminated at 1:41 p.m.
3    Witness my official signature and seal as
4 Notary Public in and for Cook County, Illinois on this
5 13th day of April, A.D. 2022.

9    Christina Cummins
    Notary Public
10   License No. 084-003157
    One North Franklin Street
11   Suite 3000
    Chicago, Illinois 60606
12   Phone: 312.442.9087

Page 188

1    Veritext Legal Solutions
    1100 Superior Ave
2    Suite 1820
    Cleveland, Ohio 44114
3    Phone: 216-523-1313

4 April 15, 2022
5 To: Mr. Mathues
6 Case Name: Prince, Shaquille v. Sgt. Michienszi #357, Et Al.
7 Veritext Reference Number: 5091461
8 Witness: Michael Michienzi    Deposition Date: 3/29/2022
10 Dear Sir/Madam:
11
12 Enclosed please find a deposition transcript. Please have the witness
13 review the transcript and note any changes or corrections on the
14 included errata sheet, indicating the page, line number, change, and
15 the reason for the change. Have the witness' signature notarized and
16 forward the completed page(s) back to us at the Production address shown
17 above, or email to production-midwest@veritext.com.
18
19 If the errata is not returned within thirty days of your receipt of
20 this letter, the reading and signing will be deemed waived.
21 Sincerely,
22 Production Department
23
24 NO NOTARY REQUIRED IN CA

Page 189

1    DEPOSITION REVIEW
    CERTIFICATION OF WITNESS
2
    ASSIGNMENT REFERENCE NO: 5091461
3    CASE NAME: Prince, Shaquille v. Sgt. Michienszi #357, Et Al.
    DATE OF DEPOSITION: 3/29/2022
4    WITNESS' NAME: Michael Michienzi
5    In accordance with the Rules of Civil
    Procedure, I have read the entire transcript of
6 my testimony or it has been read to me.
7    I have made no changes to the testimony
    as transcribed by the court reporter.
8 _____   _____
9 Date         Michael Michienzi
10    Sworn to and subscribed before me, a
    Notary Public in and for the State and County,
11 the referenced witness did personally appear
    and acknowledge that:
12
    They have read the transcript;
13    They signed the foregoing Sworn
        Statement; and
14    Their execution of this Statement is of
        their free act and deed.
15
    I have affixed my name and official seal
16
    this _____ day of_____, 20____.
17
        _____
18    Notary Public
19    _____
    Commission Expiration Date

Page 190

1    DEPOSITION REVIEW
     CERTIFICATION OF WITNESS
2
     ASSIGNMENT REFERENCE NO: 5091461
3    CASE NAME: Prince, Shaquille v. Sgt. Michienszi #357, Et Al.
     DATE OF DEPOSITION: 3/29/2022
4    WITNESS' NAME: Michael Michienzi
5    In accordance with the Rules of Civil
     Procedure, I have read the entire transcript of
6    my testimony or it has been read to me.
7    I have listed my changes on the attached
     Errata Sheet, listing page and line numbers as
8    well as the reason(s) for the change(s).
9    I request that these changes be entered
     as part of the record of my testimony.
10
     I have executed the Errata Sheet, as well
11   as this Certificate, and request and authorize
     that both be appended to the transcript of my
12   testimony and be incorporated therein.
13   _____   _____
     Date             Michael Michienzi
14
     Sworn to and subscribed before me, a
15   Notary Public in and for the State and County,
     the referenced witness did personally appear
16   and acknowledge that:
17   They have read the transcript;
     They have listed all of their corrections
18       in the appended Errata Sheet;
     They signed the foregoing Sworn
19       Statement; and
     Their execution of this Statement is of
20       their free act and deed.
21   I have affixed my name and official seal
22   this _____ day of_____, 20____.
23   _____
     Notary Public
24
     _____
25   Commission Expiration Date

Page 191

1        ERRATA SHEET
         VERITEXT LEGAL SOLUTIONS MIDWEST
2          ASSIGNMENT NO: 5091461
3    PAGE/LINE(S) /    CHANGE    /REASON
4    _____
5    _____
6    _____
7    _____
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19
     _____   _____
20   Date             Michael Michienzi
21   SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22   DAY OF _____, 20_____ .
23   _____
     Notary Public
24
     _____
25   Commission Expiration Date