Page 1

```
 1            UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF ILLINOIS
 2                  EASTERN DIVISION
 3   SHAQUILLE PRINCE,          )
                                )
 4        Plaintiff,            )
                                )
 5     vs.                      ) No. 19-cv-7265
                                )
 6   SGT. MICHIENZI #357, et    )
     al.,                       )
 7                              )
          Defendants.           )
 8
 9        The videotaped video conference discovery
     deposition of JAHAN NURHUSSEIN, taken in the
10   above-entitled cause, before SUSAN HASELKAMP,
     Certified Shorthand Reporter for the State of
11   Illinois, on June 3, 2022, beginning at the hour
     of 9:00 a.m. and ending at the hour of 9:56
12   a.m., via Zoom, pursuant to notice.
13
14
15
16
17
18
19
20                                        EXHIBIT
21   Reported by: Susan Haselkamp, CSR       A
22   License No.:  084-004022
23   APPEARING REMOTELY FROM COOK COUNTY, ILLINOIS
24
```

Page 14

1  correct?
2     A.  I believe that was the first time I
3  encountered not -- someone not wanting to give
4  an ID.
5     Q.  When Mr. Prince and Ms. Anderson
6  entered the station, do you remember what their
7  demeanor was when they entered?
8     A.  They had an attitude towards me when
9  they walked in, they were using profane language
10 towards me, they asked me for information that
11 they requested.  I couldn't give them the
12 information that they requested because they
13 didn't give me enough information to be able to
14 provide it.
15    Q.  And when you say they were giving you
16 an attitude, you mentioned profane language, was
17 there anything else to that?  Were they
18 physically aggressive in any way?
19    A.  Not physically.
20    Q.  Were there any other visitors in the
21 station at the time when they arrived?
22        MR. MATHUES:  Objection to the extent
23 it calls for speculation.  Jahan, when I make my
24 objections, just let me finish so our court

Page 15

1  reporter can get them and then go ahead and
2  answer Ms. Hussey's questions to the best of
3  your ability, unless I give you the magic words,
4  I'm instructing you not to answer.
5        THE WITNESS:  I don't believe so, but I
6  can't be 100 percent certain.
7  BY MS. HUSSEY:
8     Q.  Absolutely.  And we understand this was
9  a few years ago, so we just want to the best of
10 your knowledge.
11    A.  To the best of my knowledge, I can't
12 say yes or no.
13    Q.  Yes.  And I apologize, sometimes I'll
14 be looking down, I've got some questions I'm
15 working through so it can take me some time to
16 gather my thoughts.
17       How often would you say you dealt with
18 someone coming in to pick up a FOIA request?
19    A.  This happens daily.  Multiple times a
20 day.
21    Q.  When you told them that you couldn't
22 give them the information they had asked for,
23 how did they react?
24    A.  Well, I asked if they can give me their

Page 16

1  name, they told me that they didn't have to give
2  me their information.  They used profane
3  language, they cursed at me.  And they were
4  very, very rude to me.
5        I tried to ask them, well, what
6  happened so I can possibly get more information
7  to be able to find the FOIA request based off of
8  the narrative, and they were very upset at me
9  and telling me that I didn't have a right to
10 question them.
11    Q.  Did they mention at this time that they
12 also wanted to file a complaint against an
13 officer?
14    A.  Not at that time.  It was later on.
15    Q.  You say it was later on.  What occurred
16 between requesting the FOIA results and
17 requesting to file a complaint?
18    A.  They didn't ask to file the complaint
19 against the officer until I gave them -- I found
20 the FOIA that they were requesting and they
21 started to read it.
22    Q.  How long approximately did it take you
23 to find the FOIA results?
24    A.  Maybe less than five minutes, not even.

Page 17

1     Q.  And you mentioned they started to read
2  the FOIA request while at the station; is that
3  correct?
4     A.  Correct.
5     Q.  And it was after reading those results
6  that they asked for a complaint form; is that
7  correct?
8     A.  Correct.
9     Q.  Do you know is there a department
10 policy when an individual comes into the
11 department wishing to file a complaint against
12 an officer?
13    A.  You said is there a policy?
14    Q.  Yes.
15    A.  Yes.
16    Q.  What is the policy?
17    A.  Typically if someone is coming in to
18 file a complaint against an officer, we would
19 get their information and call it up to dispatch
20 and then the information would be name, address,
21 phone number and reason why they want to file a
22 complaint and then we'll call a sergeant in.
23       If it's against a sergeant, then we
24 would call a commander in; if it's against a

5 (Pages 14 - 17)

Page 18

1 commander, we will notify the deputy chief and
2 so on and so on.
3   Q.  Was there any form, like a complaint
4 form that was provided to people who wanted to
5 file a complaint?
6   A.  That form is given by the sergeant or
7 commander, whoever is coming to do the
8 complaint.
9   Q.  So did you have copies or I suppose
10 whoever was working your position at the front
11 of the police department, would you have copies
12 of that complaint form?
13   A.  Records keeps a copy of every type of
14 complaint form that we have, but it's not our
15 duties to give those out.  It's the duties of a
16 sergeant or a commander or someone above my pay
17 grade.
18   Q.  Is there any reason that you know of
19 that you couldn't just give them the form if you
20 have one?
21   A.  During that time, usually the sergeant
22 or a commander or whoever was doing the
23 complaint would hear the complaint, give the
24 form and notify them of their rights on how to

Page 19

1 fill it out.
2   Q.  Okay.  I'm going to bring up a policy,
3 which I will label as Exhibit 1.  Let's see if I
4 can --
5        (Whereupon, Nurhussein
6         Deposition Exhibit No. 1 was
7         marked for identification.)
8 BY MS. HUSSEY:
9   Q.  Can you see the document I'm sharing?
10   A.  I can.
11   Q.  Okay.  As you can see, it says
12 Exhibit 1.  I'll scroll down.
13        MR. MATHUES:  Megan, can you make it a
14 little bit bigger?
15        MS. HUSSEY:  Yes, absolutely.
16 BY MS. HUSSEY:
17   Q.  Is that sufficient?
18   A.  Yes.
19   Q.  A little bit -- a little bit bigger.
20        Okay.  As you can see, this says --
21 this is from the police department, the
22 Romeoville Police Department and it's a policy
23 regarding citizen complaints.  Can you see that?
24   A.  I can.

Page 20

1   Q.  And have you ever seen this policy
2 before?
3   A.  It's a part of my general order, so I
4 went through each one when I got hired, but it's
5 been a while.
6   Q.  And you were hired in 2011, if I
7 recall?
8   A.  Correct.
9   Q.  You said it's been a while.  So is
10 there any requirements to review these policies
11 in any particular time period?
12        MR. MATHUES:  I would object to the
13 form, vague as to who is -- who would be -- who
14 in the police department would be required.
15        MS. HUSSEY:  I'll restate my question.
16 BY MS. HUSSEY:
17   Q.  Did you in your role at the police
18 department, were you required to review these
19 sort of -- this policy after your initial
20 hiring?
21   A.  No.
22   Q.  And when you were initially hired, did
23 you receive any particular training on this
24 policy, other than just receiving a copy of the

Page 21

1 general order?
2   A.  The only training I was given was on
3 who to call when someone wants to file a
4 complaint, because I don't handle complaints.
5   Q.  And I'm going to scroll down now to the
6 second page.
7        So can you see here it says at B, all
8 complaints made against the department or its
9 members will be investigated, in-person
10 complaints will, in all possible cases, be taken
11 by the on-duty supervisor.  Complaints may be
12 made in several ways:  In person by the citizen,
13 directly to a police department supervisor; by
14 telephone; through a third person; by referral
15 from some other official or unofficial agency.
16 Does that -- is what I read what appears on this
17 page?
18   A.  Yes.
19   Q.  When it says here in-person complaints
20 will, in all possible cases, will be taken by an
21 on duty supervisor, what do you understand in
22 all possible cases to mean there?
23   A.  Whenever a supervisor is available.
24   Q.  And what would you do if a supervisor

Page 30

1  go back there.  I stopped to use the bathroom.
2  And by the time I was done with that, I came to
3  the jail.  I noticed that Ms. Anderson was in
4  lockup, which wasn't what I remember seeing on
5  the camera before I left.  So that's the only
6  other time I saw her.
7      Q.  So you didn't see Ms. Anderson coming
8  into the station, having been arrested?
9      A.  I did not see her get arrested.  I
10 wasn't in the office at that time.
11     Q.  Did you talk to Mr. Michienzi about
12 Mr. Prince or Ms. Anderson after they initially
13 left the station?
14     A.  No, I did not.
15     Q.  And did you talk to Sergeant Michienzi
16 about them at all later?
17         (Whereupon, the court reporter
18          lost Zoom internet connection.)
19         THE COURT REPORTER:  I'm sorry, I was
20 kicked out again and brought back, and I'm not
21 sure -- can we go off the record a moment?
22         MS. HUSSEY:  Absolutely.
23         THE VIDEOGRAPHER:  This is the end of
24 media one we are going off the record the time

Page 31

1  is the three 5 a.m.
2         (Whereupon, a short break was
3          taken.)
4         (Whereupon, the record was read
5          as requested.)
6         THE VIDEOGRAPHER:  We are back on the
7  record.  This is the beginning of media two.
8  The time is 9:37 a.m.  Please proceed.
9  BY MS. HUSSEY:
10     Q.  I will repeat my last question from
11 where we broke off then.
12         Did you speak to Sergeant Michienzi
13 about Mr. Prince at any point following the
14 incident?
15     A.  No, I did not.
16     Q.  And did you speak to any other officers
17 about Mr. Prince?
18     A.  The only other people that were -- I
19 asked about him was the coat officers and they
20 didn't see anything, so I was just inquiring why
21 the -- why Ms. Anderson was in the jail.
22     Q.  And did you speak to any officers about
23 the chase that took place, the chase of
24 Mr. Prince outside the police department?

Page 32

1      A.  No, I did not.
2      Q.  And I'm going to return quickly to one
3  of my other questions, I think I have some
4  better language now.
5          Is it normal to run someone's name
6  through leads or another database for warrants
7  when they come in to file a complaint?
8          MR. MATHUES:  I would object to the
9  extent it calls for speculation.  But you can --
10 you can answer.
11         THE WITNESS:  Only if -- so anytime
12 that someone comes into the police department,
13 we call their information up to dispatch.
14 Typically whenever we call their information up
15 to dispatch, dispatch runs people all the time.
16         So that can be done through dispatch or
17 through the front desk, as well.  Only if any --
18 it's cause to do so.
19 BY MS. HUSSEY:
20     Q.  You say only if it's cause to do so.
21 So what would be some causes that would require
22 you to search through the system?
23     A.  If someone -- if someone is picking up
24 a vehicle and they want to pick up their

Page 33

1  vehicle, I run them.  If someone is -- there's
2  so many reasons.  Different FOIA requests
3  require us to run it just to make sure that
4  we're not giving information out to someone that
5  doesn't deserve it -- or well, not deserve.  But
6  can ask for that information through law, things
7  like that.  It's a various -- various of reasons
8  why we run people.  We don't just run for fun.
9      Q.  You say there are various reasons.  Do
10 you have an estimate maybe percentage-wise of
11 the number of people who come into the station
12 for whom a leads check is run or their name is
13 run through the database?
14     A.  I can't tell you what dispatch would
15 run because we call their information up to
16 dispatch.  That's typical policy, we call up.
17 But from a records standpoint, I run people
18 about three or four times a day on an average.
19     Q.  And what sort of information would a
20 record search that you're doing produce, like
21 what sort of records, I suppose?
22     A.  If we had to to do a lead search, it
23 would be a wanted person or if it is something
24 in the lines of like their vehicle information

Page 34

1  or any attached people to their driver's license
2  or vehicle, things like that.
3     Q.  So either dispatch or you at the front
4  desk could run a lead search for a warrant; is
5  that correct?
6     A.  Correct.  Or an officer.
7     Q.  And do you generally inform people when
8  you're running such a search?
9     A.  No.  There's no need for us to inform
10 people.
11    Q.  So in this particular case, you
12 mentioned that's one of the possible reasons for
13 running a search of the system would be certain
14 FOIA requests.  Do you know now as we speak what
15 sort of FOIA requests would require you to run a
16 search for someone's name?
17    A.  That is typically done before they get
18 there and that is typically done if someone is
19 requesting certain information.  Maybe if they
20 don't own the vehicle or they don't own the
21 house that they're requesting, they're not
22 registered to something that they're requesting,
23 it will give us a better judgment on if we can
24 give that information out.

Page 35

1     Q.  And to your knowledge, do you know if
2  you ran a search on Mr. Prince or Ms. Anderson
3  when they arrived at the station?
4     A.  Not to my knowledge in leads, no.
5     Q.  You say not in leads.  Did you run any
6  other sort of search?
7     A.  I looked up Mr. Prince's information
8  through Laser Fish (phonetic) to see why he
9  was -- what he was requesting, because he was
10 only giving me general statements on what he was
11 requesting and I couldn't find his FOIA request
12 based off of just general information at the
13 front.  I would need more detail, so I looked
14 through Laser Fish to find his request.
15    Q.  And what is Laser Fish?
16    A.  It's just like a computer file that
17 keeps all our -- our police reports.  So it's
18 just a system where we use to be able to store
19 our -- all our documents in.
20    Q.  And you -- so you don't recall running
21 a lead search.  And so did you send Mr. Prince
22 and Ms. Anderson's information to dispatch?
23    A.  Mr. Prince and Ms. Anderson didn't give
24 me their information.

Page 36

1     Q.  Have you spoken to anyone about the
2  events that occurred on December 21, 2018 --
3     A.  No.
4     Q.  -- besides your lawyer?
5     A.  No.
6     Q.  So have you spoken to Sergeant
7  Michienzi about them?
8     A.  No.
9     Q.  Have you spoken to Detective Dorsey
10 about them?
11    A.  No.
12    Q.  Have you sent any e-mails about the
13 incident?
14    A.  No.
15    Q.  Any text messages?
16    A.  No.
17    Q.  Have you looked for any such e-mails or
18 text messages?
19    A.  I wouldn't have anything to look for.
20 I didn't send anything.
21    Q.  At any point were you asked to preserve
22 e-mails or text messages if you did have them?
23    A.  I'm sorry?
24    Q.  At any point were you asked to

Page 37

1  preserve, kind of maintain on the system any
2  such e-mails or text messages you might have?
3     A.  I didn't have any -- I didn't -- I
4  don't use my phone for work communications and I
5  don't have any e-mails that I could preserve.
6  But that would be done through IT.
7     Q.  So regardless of whether or not there
8  are e-mails -- were you ever personally asked to
9  preserve any e-mails or text messages you would
10 possibly have?
11    A.  That wouldn't be my job to preserve.
12 It would be IT.
13    Q.  Have you had any interactions with
14 Mr. Prince or Ms. Anderson after December 21,
15 2018?
16    A.  Not to my knowledge, no.
17        MS. HUSSEY:  I believe that is
18 everything I have.  Yes, I think that's
19 everything I have.  Thank you, Ms. Nurhussein.
20 I'm going to -- Mr. Mathues will have the
21 opportunity to ask some questions.
22              EXAMINATION
23 BY MR. MATHUES:
24    Q.  Jahan, I'm going to fill in a few gaps