Page 1

1         UNITED STATES DISTRICT COURT
            NORTHERN DISTRICT OF ILLINOIS
2                 EASTERN DIVISION
3   SHAQUILLE PRINCE,                )
                                     )
4         Plaintiff,                 ) Case No. 19-cv-7265
                                     )
5       vs.                          ) Judge Robert Gettleman
                                     )
6   SGT. MICHIENZI #357, et al.,     ) Magistrate Judge Susan Cox
                                     )
7         Defendants.                )
8
9
10
11
12
13
14
15
16        The videotaped remote deposition of MICHAEL
17   MICHIENZI, taken before Christina M. Cummins, CSR and
18   Notary Public, pursuant to the Federal Rules of Civil
19   Procedure for the United States District Courts
20   pertaining to the taking of depositions, at 9:33 a.m. on
21   the 29th day of March, A.D., 2022.
22
23                                           **EXHIBIT**
24                                              **C**

Page 26

1 half one time.
2    Q   Okay. And I'm looking at the lawsuit.
3 Miss Taylor alleges that, and I'll read from it, at this
4 point and without notice Sergeant Michienzi grabbed the
5 traffic citation from Kenisha Taylor's hands, tore same
6 in half along with torn pieces of the traffic citation.
7 Further, both officers directed Kenisha Taylor to not
8 speak of this with anyone else. Is there any part of
9 what I just read that is not true, that you believe is
10 not true?
11    A   Yes, sir.
12    Q   What part?
13    A   The ripping it out of her hands and forcing
14 her not -- or informing her not to talk about this with
15 anybody else.
16    Q   Well, she's alleging that you tore it in half
17 and you're agreeing you tore it in half, correct?
18       MR. MATHUES: Objection to mischaracterize --
19    objection to lack of foundation to the extent it
20    mischaracterizes testimony.
21    A   As I answered before and as part of her
22 allegation says, yes, I did tear the ticket one time in
23 half.
24

Page 27

1 BY MR. KRONE:
2    Q   Do you make it a habit of destroying evidence?
3       MR. MATHUES: Objection to argumentative and
4    to legal conclusion.
5    A   I never made it a habit to destroy evidence.
6 This was not evidence in the traffic prosecution, as I
7 answered. She was worried that she was going to be
8 prosecuted for it. I already started documentation and
9 I already called my supervisor to let them know the
10 incident. At no point was the tear affecting the
11 destruction of the evidence in hand because you could
12 totally tell on the cit -- on the citation copies what
13 was depicted on there.
14 BY MR. KRONE:
15    Q   Well, she could have used her copy for
16 evidence in her civil lawsuit, correct?
17       MR. MATHUES: Objection to the extent it calls
18    for speculation.
19    A   She did, sir. Part of this question is a
20 little open ended, and she did speak to an attorney
21 already. She did take a picture with her phone of the
22 ticket. So she had all that. And it was never
23 discarded and it was kept in a file and I presented it
24 to my commander.

Page 28

1 BY MR. KRONE:
2    Q   So you kept the torn-up ticket in a file?
3    A   And provided it to my administration, yes,
4 sir.
5    Q   So what was the purpose of tearing the ticket
6 in the first place?
7    A   As I answered, Miss Taylor was worried when
8 she handed me the ticket that it was -- she was still
9 going to get prosecuted for the traffic violation. I
10 tried reassuring her that it would not happen. She did
11 not believe so. I asked her what might help. She said
12 the ticket being torn up, and I tore it one time to not
13 destroy the entire ticket and to still be able to show
14 the evidence of what was depicted in the pressure of the
15 carbon copy on three and four.
16    Q   All right. So Miss Taylor actually asked you
17 to tear up the ticket?
18    A   To show proof of somehow that she was not
19 going to get prosecuted.
20    Q   And although Miss Taylor alleges you informed
21 her not to speak with anyone about this, you dispute
22 that allegation?
23    A   Yes, one hundred percent.
24    Q   When a citizen comes in to the Romeoville

Page 29

1 department and wants to file a complaint against an
2 officer, is there a policy in place for that?
3    A   Yes, there are -- there are I believe more
4 than one policy.
5    Q   To the best of your knowledge, walk me through
6 the procedure when a citizen comes in and wants to file
7 a complaint.
8    A   When a citizen comes in to file a complaint,
9 they should speak to the direct supervisor of the person
10 being complained a got -- complained against. They are
11 provided with a physical complaint form, given the
12 instructions on how to fill it out, allowed to give
13 their version or allegation of the events. And then the
14 supervisor should clarify any questions, answer any
15 questions, take notes and gather all pertinent evidence
16 and find out if any video or audio or witnesses are
17 available to prove or disprove the complaint.
18    Q   How many complaints to your knowledge have
19 been filed against you by citizens?
20       MR. MATHUES: Objection to form, vague as to
21    complaints.
22    A   Maybe a handful in my career, sir.
23 BY MR. KRONE:
24    Q   So five?

Page 182

1  A   Yes.
2  BY MR. MATHUES:
3  Q   Would it be fair to say in summary that
4  relatively early in your encounter with Mr. Prince you
5  had some level of suspicion that he might have a
6  warrant, and that level of suspicion increased as the
7  encounter continued?
8  A   Yes, sir.
9  Q   You also gave some testimony to Mr. Krone
10 about being fearful, amped up, words to that effect when
11 you encountered Mr. Prince with his hands in his
12 pockets.  Do you remember that testimony?
13 A   Yes, sir.
14 Q   And from the time that we'll say you were with
15 Mr. Prince in the Village of Romeoville's parking lot up
16 until the time that you later encountered Mr. Prince
17 with his hands in his pockets, did you get any
18 additional information that raised your level of concern
19 in terms of the potential risk to your safety?
20 A   Yes.
21 Q   What is that information and how did you
22 receive that information?
23 A   My dispatcher at the time gave a code of 10-0,
24 officer safety alert for a prior charge of -- that

Page 183

1  Mr. Prince had.
2  Q   At the time that you got that dispatch code,
3  did you know exactly what -- strike that.
4      When you say an alert, what do you mean by an
5  alert?
6  A   So one of the things in law enforcement is
7  the -- not to give a subject a heads up that something
8  might be coming law enforcement wise.  So we use 10
9  codes and phonetic alphabet.  A 10 code came across the
10 air, and the 10 code was 10-0, an officer safety alert.
11 Q   And did you get that 10-0 officer safety alert
12 with respect to Mr. Prince?
13 A   Yes, I did.
14 Q   Now, it sounds like you know the basis for
15 that code, is that fair to say?
16 A   Yes.
17 Q   At the time you first heard the 10-0 over the
18 radio did you know what the basis for that alert was or
19 were you just aware that there was the 10-0 flag?
20 A   I was alert that it was just a 10-0 officer
21 safety.
22     MR. MATHUES:  And that's all I have.
23     MR. KRONE:  I've got one or two more
24 questions, Mr. Michienzi.

Page 184

1         FURTHER EXAMINATION
2  BY MR. KRONE:
3  Q   Putting aside -- you know, the second time
4  Mr. Prince came back and asked to file a complaint,
5  putting aside whether or not you should have given him a
6  complaint form, did he ask to file a complaint against
7  you specifically?
8  A   The second time he did.
9  Q   The second time.  Was it just you or did he
10 ask to file one against someone else also?
11 A   I believe it was just me.
12 Q   And putting aside the giving him a complaint
13 form, it wouldn't make sense for you yourself to take
14 the complaint since he wanted to complain about you,
15 correct?
16 A   It would have been a conflict of interest.
17 Q   Right.  And that makes complete sense to me.
18 I think you said that sergeant, I'm probably going to
19 butcher his name, Bejgrowicz was with you, is that the
20 name?
21 A   Bejgrowicz.
22 Q   Bejgrowicz.  Could he have not taken a
23 complaint from Mr. Prince?
24 A   I don't believe we think so because he's not

Page 185

1  my supervisor.
2  Q   Okay.  So the policy to your knowledge
3  dictates that it has to be an officer's supervisor who
4  takes a complaint?
5  A   The practice is, yeah, that the supervisor of
6  the subject being complained against takes the
7  complaint.
8      MR. KRONE:  That's all I have.
9      MR. MATHUES:  Nothing based on that.
10     MR. KRONE:  Okay.  All right.
11     VIDEOGRAPHER:  We are off the record at
12 1:41 p.m.  This concludes today's testimony given
13 by Michael Michienzi.  The total number of media
14 units used was three and will be retained by
15 Veritext.
16
17     (WITNESS EXCUSED.)